IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

SHANTWAUN J TURNER,

      Plaintiff,

v.                           CASE NO. 4:15-cv-334-WS-GRJ

BRIAN DAVIS, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on ECF No. 44, Defendant Special

Agent Patrick Sanford's Motion to Dismiss or, in the Alternative, Motion for

Summary Judgement, and ECF No. 49, Defendant Brian Davis' Motion for

Summary Judgment and Incorporated Statement of Facts and

Memorandum of Law. Plaintiff has filed a response in opposition to

Defendant Sanford's motion to dismiss, or in the alternative, motion for

summary judgment and Defendant Davis' motion for summary judgment.

(ECF No. 58.) The motions are, therefore, ripe for review. For the reasons

explained below, it is recommended that both motions be granted.

## I.  INTRODUCTION

Plaintiff's claims center around his December 1, 2011 arrest, in which

Plaintiff was shot twice by law enforcement while being arrested. Following Plaintiff's arrest, he was convicted by a jury on seven counts, including aggravated assault on a law enforcement officer with a firearm and resisting a law enforcement officer with violence. Plaintiff's second amended complaint names three Defendants: (1) Special Agent Patrick Sanford; (2) Sergeant Brian Davis; and (3) Officer Ernest Gorham. (ECF No. 9.) Plaintiff alleges that Agent Sanford and Sergeant Davis used excessive force while arresting Plaintiff in violation of the Fourth Amendment by shooting Plaintiff as he was fleeing.[1] Plaintiff further says that Defendants Sanford and Davis failed to investigate adequately the tip they received before arresting Plaintiff and failed to identify themselves as law enforcement officers.

Analysis of Plaintiff's claims requires the Court to focus upon the nature of the claims and against whom each of the specific claims is directed. Plaintiff's claims are properly viewed as Fourth Amendment excessive force claims related to each Defendant distinct from the other Defendants. Additionally, with regard to Agent Sanford, a Special Agent with the Federal Bureau of Investigations ("FBI"), Plaintiff's claim is

---

[1] Plaintiff's claims against Officer Gorham will be addressed via separate report and recommendation.

properly construed as one pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

Agent Sanford requests that the Court dismiss this action because the Court lacks subject matter jurisdiction and Plaintiff has failed to state a claim upon which relief may be granted. (ECF No. 44 at 1.) Alternatively, Agent Sanford requests the Court to enter summary judgment in his favor because the evidence filed by Agent Sanford in support of the motion demonstrates that there is no genuine issue of material fact that Agent Sanford is entitled to qualified immunity. (*Id.* at 1–2.)

In support of his motion, Agent Sanford has submitted: (1) Plaintiff's trial testimony; (2) Agent Sanford's trial testimony; and (3) Plaintiff's state court judgment of conviction. (ECF Nos. 44-1–44-3.)  Under Fed. R. Civ. P. 12(d), when matters outside the pleadings are presented in support of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the motion must be treated as one for summary judgment under Fed. R. Civ. P. 56. Because Agent Sanford's motion relies upon matters outside of the pleadings, the Court issued a summary judgment notice on March 2, 2016, advising Plaintiff that the Court will consider the matter as a summary judgment motion. (ECF No. 46.) The notice informed Plaintiff that he was required to file any supporting evidentiary materials, such as counter-affidavits,

depositions, and exhibits, within 21 days, and may not rely solely on the allegations of the issue pleadings in opposing the summary judgment motion. (*Id.*) Likewise, the Court issued a second summary judgment notice on March 18, 2016, advising Plaintiff of the same obligation with respect to Sargeant Davis' motion for summary judgment. (ECF No. 51.) As of July 5, 2016, Plaintiff failed to respond. Accordingly, the Court issued an order to show cause directing Plaintiff to show cause as to why the motions should not be granted. (ECF No. 55.)

Plaintiff subsequently filed his response in opposition to both Agent Sanford's motion and Sergeant Davis' motion. (ECF No. 58.)

Pursuant to Fed. R. Civ. P. 56(c),

[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Furthermore,

[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56( c), the court may:
(1) give an opportunity to properly support or address the

fact;
      (2) consider the fact undisputed for purposes of the
motion;
      (3) grant summary judgment if the motion and supporting
materials—including the facts considered undisputed—show
that the movant is entitled to it; or
      (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

In this case, Plaintiff declined to submit any evidentiary materials in
opposition to summary judgment. Nonetheless, 28 U.S.C. § 1746 provides,

> [w]herever, under any . . . rule, . . . any matter is required or
> permitted to be supported, evidence, established, or proved by
> the sworn declaration, verification, certificate, statement, oath,
> or affidavit, in writing of the person making the same . . . such
> matter may, with like force and effect, be supported, evidence,
> established, or proved by the unsworn declaration, certificate,
> verification, or statement, in writing of such person which is
> subscribed by him, as true under penalty of perjury, and dated .
> . . .

Although Plaintiff did not submit any sworn affidavits or other
evidentiary materials in opposition to summary judgment, Plaintiff's second
amended complaint is signed under penalty of perjury. (ECF No. 9.) Thus,
Plaintiff's second amended complaint is properly treated by the Court like a
sworn affidavit. *See Sammons v. Taylor*, 967 F.2d 1533, 1545 n.5 (11th
Cir. 1992) ("[T]his Court has recognized that facts alleged in an inmate's
sworn pleading are sufficient [to defeat a properly supported motion for
summary judgment] and that a separate affidavit is not necessary.").

Plaintiff's sworn allegations in his second amended complaint, therefore, may be considered in ruling on the motion for summary judgment.[2]

## II. EVIDENCE

In December 2010, the State of Florida placed Plaintiff on three years' probation for selling marijuana to an undercover police officer. (ECF No. 9 at 6 ("Compl.")) Plaintiff failed to report to his probation officer in May 2011, which resulted in the issuance of a violation of probation ("VOP") warrant for his arrest in June 2011. (*Id.*)

Prior to December 1, 2011, the FBI and Florida Department of Law Enforcement ("FDLE") were jointly investigating violent gang activity and reliable threats of armed takeover-style bank robberies, including taking hostages. (Davis Aff. ¶ 6.) During the course of the joint operation, the Tallahassee Police Department ("TPD") obtained information from a confidential informant ("CI") that Plaintiff was the armed and dangerous person who was responsible for several of the armed bank robberies and homes invasions in a nearby county. (Compl. at 7; ECF No. 44-2 at 175, ln. 24–25, 176, ln. 1–8 ("Sanford Tr."); ECF No. 48, Ex. A, ¶ 6 ("Davis Aff.").)[3]

---

[2] Consequently, the facts asserted by Plaintiff upon which the Court will rely are contained within Plaintiff's sworn second amended complaint, ECF No. 9.

[3] Citations to page numbers for "Sanford Tr." are the transcript page numbers located in the upper right-hand corner of the transcript page.

The CI indicated that she was Plaintiff's girlfriend. (Davis Aff. ¶ 6.) At that point, they had been dating for almost four year. (ECF No. 44-1 at 344, ln. 8–11 ("Pl. Tr.").)[4] According to Plaintiff, however, the TPD did not adequately investigate the tip and merely assumed that the tip was credible. (Compl. at 7.)

On December 1, 2011, the FDLE contacted TPD's Gang Response Unit for assistance in locating and arresting Plaintiff. (Davis Aff. ¶ 5.) At the time, Sergeant Davis was a Sergeant with the TPD and supervisor of the TPD's Gang Response Unit. (*Id.* ¶ 2.) During FDLE's operating briefing, Sergeant Davis learned about the joint operation and the CI's tip. (*Id.* ¶ 6.) Sergeant Davis also learned that Plaintiff had been identified as the second in command of a Gadsden County gang known as the "Weedside Boys." (*Id.*) Further, Sergeant Davis was informed that Plaintiff aspired to become the leader of the gang and was using violence to assert his dominance, including pistol whipping gang members who opposed him. (*Id.*) Plaintiff was always armed with a handgun, had access to at least two different handguns, and had an extensive criminal history, including violent felonies. (*Id.*) He had also previously been convicted of robbery and

---

[4] Citations to page numbers for "Pl. Tr." are the transcript page numbers located in the upper right-hand corner of the transcript page.

kidnaping. (*Id.*) Despite the joint task force's efforts prior to December 1, 2011, the task force had been unsuccessful in locating Plaintiff. (*Id.*) Sergeant Davis was asked to help develop an operations plan to effectuate Plaintiff's arrest that night. (*Id.* ¶ 7.) FBI Special Agent Sanford was also present to assist the TPD in effectuating Plaintiff's. (Sanford Tr. at 132, ln. 13–14.)

Plaintiff and his girlfriend planned to meet that night. (Davis Aff. ¶¶ 5, 8; Pl. Tr. at 343, ln. 24–25, 344, ln. 1–20.) Sergeant Davis says they were supposed to meet at the Southside Shopping Plaza, but Plaintiff changed the plan to meet at an apartment complex on South Meridian Street. (Davis Aff. ¶¶ 9, 11–12.) Plaintiff, however, says they were supposed to meet at the Meridian Walk Apartments. (Pl. Tr. at 344, ln. 14–20.) Plaintiff was aware police were looking for him because he had violated the terms of his probation. (*Id.* at 345, ln. 15–17, 354, ln. 23–24.) He also suspected his girlfriend was setting him up by aiding law enforcement in Plaintiff's arrest. (*Id.* at 344, ln. 21–25, 345, ln. 11–18.) At the time, Plaintiff had a concealed firearm in his pocket with an altered serial number. (*Id.* at 345, ln. 16, 351, ln. 1–10.) Plaintiff changed the plan to meet in Harvey's parking lot so he would be able to get away from Meridian Walk Apartments and head to a different apartment complex instead of meeting up with his girlfriend. (*Id.* at

345, ln. 18–21.)

Sometime around 11:00 p.m., Sergeant Davis arrived in position where he could observe the apartment complex and observed an individual matching Plaintiff's description, dressed in all red, exit from one of the apartment complex's units. (Compl. at 7; Davis Aff. ¶ 13.) The individual began walking in the direction of Sergeant Davis' location, during which, the CI identified Plaintiff as the individual they were looking for. (Davis Aff. ¶¶ 13, 15.)

After the CI's identification, the TPD and FBI arrived on-scene in two unmarked vehicles and observed Plaintiff walking on the sidewalk. (*Id.* ¶¶ 17, 19.)  Officer Gorham, dressed in a police uniform, was in one of the unmarked vehicles. (Davis Aff. ¶¶ 17, 19, 28; Compl. at 7.) Agent Sanford, wearing a dark vest with "FBI" in large light colored letters on the front, was driving the other unmarked vehicle. (Davis Aff. ¶¶ 17, 19, 29; Compl. at 7.) Officer Gorham's vehicle pulled in front of Plaintiff. (Davis Aff. ¶¶ 17, 19; Compl. at 7.) At the same time, Agent Sanford approached Plaintiff from behind. (*Id.*)

According to Agent Sanford and Sergeant Davis, as Officer Gorham's car pulled in front of Plaintiff, Plaintiff got into a fighting stance, pulled his gun out with two hands, and pointed the gun at Officer Gorham.

(Sanford Tr. at 138, ln. 2–9; Davis Aff. ¶ 18.) Agent Sanford started yelling that Plaintiff had a gun. (Sanford Tr. at 141, ln. 10.) Sergeant Davis says he also heard someone say over the radio that Plaintiff had a gun. (Davis Aff. ¶ 18.) As Agent Sanford's vehicle approached Plaintiff from behind, Plaintiff turned around toward Agent Sanford. (Sanford Tr. at 142, ln. 4–21; Davis Aff. ¶ 20.) Agent Sanford says that as Plaintiff turned around, he also turned his gun toward Agent Sanford. (Sanford Tr. at 142, ln. 22–23.)

At that point, Plaintiff began running toward AGent Sanford's vehicle and in the direction of Sergeant Davis' position. (Sanford Tr. at 143, ln. 5–23; Davis Aff. ¶ 20.) Agent Sanford, who had not put his vehicle in park yet, jumped out of his vehicle, drew his gun and crouched behind the door in fear for his life. (Sanford Tr. at 142, ln. 8–25, 143, ln. 1–25, 144, ln. 1–4, 147 ln. 3–12.) As Plaintiff cleared Agent Sanford's doorjamb, seeing that Plaintiff still had the gun in his hands, Agent Sanford shot at Plaintiff twice. (*Id.* at 143, ln. 19–25; 145, ln. 1.) From Sergeant Davis' location Sergeant Davis heard at least two gun shots and saw what he believed was a "muzzle flash" from Plaintiff's gun. (Davis Aff. ¶ 21.) Thus, it appeared to Sergeant Davis that Plaintiff and Agent Sanford had fired at each other. (*Id.*)

Plaintiff's version of events, as asserted in the complaint, are slightly

different. According to Plaintiff, Officer Gorham jumped out of his vehicle in front of Plaintiff with his gun drawn and pointed at Plaintiff. (Compl. at 7.) Officer Gorham did not identify himself as a law enforcement officer. (*Id.*) Plaintiff says that the area is well known for armed robberies and murders so he feared for his life. (*Id.*) Thus, Plaintiff turned and started running away. (*Id.*) As he ran past Agent Sanford, without identifying himself as a law enforcement officer, Agent Sanford fired at Plaintiff, hitting him in the back of his left arm. (*Id.*)

At trial, however, Plaintiff's testimony was materially different from the events he alleged in the complaint. Plaintiff testified that he was sending text messages on his Play Station phone, which requires two hands, while he was walking down the street. (Pl. Tr. at 346, ln. 1–2, 363, ln. 3–1, 378, ln. 5–11.) Plaintiff said his head was down and he was too distracted to notice the first vehicle pull in front of him. (Pl. Tr. at 363, ln. 3–1, 378, ln. 5–11.) As Agent Sanford's vehicle approached Plaintiff from behind, Plaintiff turned around toward Agent Sanford, shocked by the sudden approach of the vehicle. (Pl. Tr. at 364, ln. 16–20, 379, ln. 13–16.) Plaintiff assumed the people in the unmarked vehicles were law enforcement officers. (*Id.* at 365, ln. 10–11.) According to Plaintiff, Agent Sanford jumped out of his car with his gun drawn and told Plaintiff to get on the

ground. (Pl. Tr. at 346, ln. 8–10.) Plaintiff took off running and was then shot in the arm. (*Id.*, ln. 10–12.) Defendant was still in possession of the firearm when Agent Sanford shot Plaintiff. (Pl. Tr. at 368, ln. 13–15.)

Despite being shot by Agent Sanford, Plaintiff continued running. (Davis Aff. ¶ 22; Sanford Tr. at 146, ln. 20–22; Pl. Tr. at 12–24; Compl. at 7.) After Agent Sanford fired two shots at Plaintiff, Agent Sanford jumped back into his vehicle, which had rolled approximately ten feet, to put the vehicle in park. (Sanford Tr. at 147, ln. 12.) While Plaintiff was running, Sergeant Davis could see a black outline of a gun in Plaintiff's hand. (Davis Aff. ¶ 22.) Sergeant Davis intended on firing at Plaintiff then, but decided to wait because Officer Gorham and another officer were behind Plaintiff and in Sergeant Davis' line of fire. (*Id.*) Plaintiff ran across the street and began running directly toward Sergeant Davis. (*Id.* ¶ 23.) Other officers were yelling "police, stop," but Plaintiff did not obey their commands. (Davis Aff. ¶ 30.)

Plaintiff says he took the gun out of his jacket pocket once he made it to the sidewalk. (Pl. Tr. at 346, ln. 13–24.) Plaintiff got rid of the gun, and kept running toward Sergeant Davis. (*Id.*; Davis Aff. ¶ 30.) Pl. Tr. at 346, ln. 13–24.) Plaintiff says he still had his cell phone in his left hand while he got rid of the gun. (Pl. Tr. at 382, ln. 5–19.) Several seconds later, Sergeant

Davis, in fear for his life after seeing what he believed to be Plaintiff shoot at Agent Sanford, fired two shots at Plaintiff. (Davis Aff. ¶ 24.)  Plaintiff says that Sergeant Davis did not identify himself to Plaintiff as law enforcement before shooting Plaintiff. (Compl. at 7.) One of the shots hit Plaintiff in the left cheek. (*Id.*; Compl. at 7; Pl. Tr. at 346, ln. 24–25.)

After being shot by Sergeant Davis, Plaintiff collapsed onto the ground. (*Id.*) Defendants and other officers surrounded Plaintiff. (Davis Aff. ¶ 26.) Sergeant Davis believed Plaintiff was still armed and ordered Plaintiff to show his hands. (*Id.*) Plaintiff did not comply and was placed in handcuffs. (*Id.*) Plaintiff pleaded for someone to call for medical help because he had been shot. (Compl. at 7.) One of the Defendants said, "oh now you're worried about dying. You dumb ass nigger, you should not have tried to run away from us. Just sit there and shut the f[uc]k up." (*Id.*)

Emergency medical services were called and Plaintiff was taken to Tallahassee Memorial Hospital for treatment. (*Id.*) Plaintiff says the wounds from Agent Sanford's shot and Sergeant Davis' shot evidence that Plaintiff was shot from behind while running away. (*Id.*) Plaintiff has nerve damage in his left hand and lost the use of his left hand as a result of Sergeant Sanford's shot. (*Id.* at 8.) He also sustained facial injuries from Sergeant Davis' shot, including the loss of teeth and a tongue injury, which has

resulted in a speech impediment. (*Id.*)

Based on the events that took place during the December 1, 2011 arrest, Plaintiff was charged with and convicted in Florida state court of: (1) two counts of Aggravated Assault on a Law Enforcement Officer with a Firearm, in violation of Fla. Stat. §§ 775.087, 784.07(2)(c); (2) Carrying a Concealed Firearm, in violation of Fla. Stat. § 790.01(2); (3) Possession of a Firearm with an Altered Serial Number, in violation of Fla. Stat. § 790.27(2); (4) Resisting a Law Enforcement Officer with Violence, in violation of Fla. Stat. § 843.01; and (5) Possession of a Firearm by a Convicted Felon, in violation of Fla. Stat. § 790.23(1)(a). (ECF No. 44-3 ("Fla. Judgment").[5]

### III.  SUMMARY JUDGEMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), the entry of summary judgment is appropriate when the Court is satisfied that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." *Samples on*

---

[5] *Florida v. Turner*, No. 2011 CF 3784 A (Fla. 2d Cir. Ct. Dec. 7, 2011).

*Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988). But,
"when opposing parties tell two different stories, one of which is blatantly
contradicted by the record, so that no reasonable jury could believe it, a
court should not adopt that version of the facts for purposes of ruling on a
motion for summary judgment." *Morton v. Kirkwood*, 707 F.3d 1276, 1284
(11th Cir. 2013) (internal quotations and citations omitted); *see also
Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) (to defeat
summary judgment "there must be evidence on which the jury could
reasonably find for the plaintiff") "The nonmovant need not be given the
benefit of every inference but only of every reasonable inference." *Brown v.
City of Clewiston,* 848 F.2d 1534, 1540 n. 12 (11th Cir.1988) ("The
summary judgment standard requires that we resolve all reasonable
doubts in favor of the non-moving party, but it does not require us to
resolve all doubts in such a manner.").

As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317
(1986), the moving party bears the initial burden of establishing the
nonexistence of a triable issue of fact. If the movant is successful on this
score, the burden of production shifts to the non-moving party who must
then come forward with "sufficient evidence of every element that he or she
must prove." *Rollins v. Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987).

The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785–86 (11th Cir. 2005). Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. *See, e.g., Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## IV.  DISCUSSION

Plaintiff alleges that Agent Sanford and Sergeant Davis violated his Fourth Amendment right by using excessive force while arresting Plaintiff on December 1, 2011. (Compl. at 8.) Agent Sanford and Sergeant Davis argue that Plaintiff's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). (ECF Nos. 44, 49.) Defendants Sanford and Davis further argue that even if Plaintiff's claims were not *Heck*-barred, they are nonetheless entitled to qualified immunity. (*Id.*)

### A.    Heck v. Humphrey

Agent Sanford and Sergeant Davis contend that Plaintiff's excessive force claims are *Heck*-barred.[6] The Court agrees that Plaintiff's claim

---

[6] Plaintiff offers no response to these arguments.

against Agent Sanford is barred by *Heck*, but disagrees that Plaintiff's

claim against Sergeant Davis is *Heck*-barred.

Under *Heck,* state prisoners are barred from pursuing § 1983 actions

that, if successful, would necessarily imply the invalidity of a plaintiff's

conviction. 512 U.S. at 477. In considering whether a § 1983 claim is *Heck*-

barred, the Court must determine whether a plaintiff's factual allegations, if

proven, would necessarily undermine the validity of the plaintiff's

conviction. *See Edwards v. Balisok*, 520 U.S. 642, 646–48 (1997). If the

factual basis of the plaintiff's civil case is "inconsistent with [his] convictions

having been valid, *Heck* kicks in and bars his civil suit." *Okoro v.*

*Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003).

For example, where a defendant is convicted of intentionally

preventing a law enforcement officer from effecting a *lawful* arrest, a

successful § 1983 *unlawful* arrest suit would necessarily negate one of the

elements of the underlying offense and would, therefore, be barred. *See*

*Heck*, 512 U.S. at 487 n.6.

This Court, however, has previously noted:

> It of course is possible for an excessive-force action and a battery
> conviction to coexist without running afoul of *Heck*.  When, for
> example, a plaintiff admits that he hit a law enforcement officer
> but asserts that the officer responded with excessive force, there
> is no *Heck* problem-a finding that the officer employed excessive
> force would not impugn the plaintiff's battery conviction.  But when

the theory of the plaintiff's excessive-force case is that he never hit the officer and that the officer attacked him without provocation, the plaintiff, in effect, is mounting a collateral attack on his battery conviction, which *Heck* does not allow.

*Harvey v. Teal*, Case No. 5:08-cv-339-RH-AK, 2010 WL 427434, at *2 (N.D. Fla. 2010) (citing *Dyer v. Lee,* 488 F.3d 876, 882–84 (11th Cir. 2007); *Smith v. Towery,* 79 F.3d 951, 952-53 (9th Cir. 1996); *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006). "[A]s long as it is possible that a § 1983 suit would not negate the underlying conviction, then the suit is not *Heck*-barred." *Dyer*, 488 F.3d at 879–80.

Plaintiff's claims are that Defendants used excessive force in effectuating his arrest. Specifically, he says they failed to adequately investigate the CI's tip. If they had, Defendants would have known Plaintiff was not responsible for the armed bank robberies and, therefore, would not have shot him when he tried to flee because the officers would not have thought he was dangerous. Plaintiff also says Defendants failed to identify themselves as law enforcement officers. If they had, Plaintiff says he would not have run and, therefore, Defendants would not have shot Plaintiff. Furthermore, Plaintiff testified that he did not pull his gun and point it at the officers, that he was simply trying to flee, and that he merely took his gun out of his pocket and slid it away while he was fleeing so it did not harm anyone. The question, therefore, is whether these claims, if

proven, would undermine the validity of his criminal convictions.

Plaintiff's excessive force claim against Agent Sanford, if proven, would undermine the validity of Plaintiff's conviction for aggravated assault on a law enforcement officer with a firearm in violation of Fla. Stat. §§ 775.087, 784.07(2)(c). Under Florida law at the time of the offense, an "assault" was an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent. Fla. Stat. § 784.011 (2011). Section 775.087 reclassifies the offense when the defendant carries, displays, uses, threatens to use, or attempts to use a weapon or firearm during the commission of a felony.[7]

Based on Plaintiff's version of the facts, however, Plaintiff never pulled his gun and pointed it at Agent Sanford and was simply trying to flee. Plaintiff's assertion in a nutshell is that he did not intentionally threaten Agent Sanford with violence, nor did he do so with a firearm. That version of facts, if accepted as true, would necessarily undermine his conviction for aggravated assault on a law enforcement officer with a firearm. *See Thore v. Howe*, 466 F.3d 173, 180 (1st Cir. 2006) (plaintiff's

---

[7] Section 784.07(2)(c) is the reclassification statute for an offense for assault or battery of a law enforcement officer.

conviction for assault on a police officer barred plaintiff's excessive force claim to the extent it was based on the theory that he did not assault the police officer); *Shaw v. Terrill*, No. 1:13-cv-129-MP-GRJ, 2014 WL 1775616, at *4 (N.D. Fla. May 1, 2014) (plaintiff's conviction for aggravated battery on a corrections officer barred his excessive force claim in which he asserted that he did not batter the corrections officer prior to the corrections officer using—allegedly excessive—force).

Plaintiff has not demonstrated that this convictions has been invalidated or overturned. Because the conviction has not been invalidated or overturned, he cannot assert a civil claim that, if proven, would undermine that conviction. Even though there may be other factual scenarios that, if proven, would not undermine the validity of Plaintiff's conviction, Plaintiff could not have been convicted of aggravated assault on a law enforcement officer with a firearm based on his version of facts. Accordingly, Plaintiff's excessive force claim against Agent Sanford is *Heck*-barred.

With respect to Sergeant Davis, however, Plaintiff's excessive force claim, if proven, would not necessarily undermine the invalidity of Plaintiff's convictions for aggravated assault on a law enforcement officer with a firearm. There are no allegations or evidence that Plaintiff threatened

Sergeant Davis with a firearm. Although Plaintiff's actions toward Agent Sanford and Officer Gorham certainly could provide the basis for Sergeant Davis' actions, it is undisputed that Plaintiff got rid of his gun before Sergeant Davis shot Plaintiff. It is possible that Sergeant Davis' actions after Plaintiff got rid of the gun constituted excessive force without undermining Plaintiff's convictions for aggravated assault on a law enforcement officer.

Similarly Plaintiff's excessive force claim against Sergeant Davis, if proven, would not necessarily undermine the validity of his conviction for resisting a law enforcement officer with violence, in violation of Fla. Stat. § 843.01. Under section 843.01, any person who "knowingly and willfully resists, obstructs, or opposes any officer . . . in the lawful execution of any legal duty, by offering or doing violence to the person of such officer or legally authorized person, commits the offense of resisting a law enforcement officer with violence. "The offense requires that a defendant '(1) knowingly (2) resisted, obstructed, or opposed a law enforcement officer (3) who was in the lawful execution of any legal duty (4) by offering or doing violence to his person.'" *Cano v. United States Atty. Gen.*, 709 F.3d 1052, 1054 (11th Cir. 2013) (quoting *Yarusso v. State*, 942 So. 2d 939, 942 (Fla. 2d DCA 2006)).

The Florida Supreme Court has held that section 843.01 is a general intent crime. *See Frey v. State*, 708 So. 2d 918, 919–20 (Fla. 1998). The Eleventh Circuit has interpreted this to mean that "the intent requirement in Fla. Stat. § 843.01 applies to both resisting arrest *and* the offer or use of violence." *Cano*, 709 F.3d at 1054 (emphasis added). "As for the nature of the force required to sustain a conviction under § 843.01, Florida's appellate courts have held that 'violence is a necessary element of the offense.'" *United States v. Romo-Villalobos*, 674 F.3d 1246, 1249 (11th Cir. 2012) (quoting *Rawlings v. State*, 976 So. 2d 1179, 1181 (Fla. 5th DCA 2008)). "One of the elements of resisting arrest with violence under section 843.01 is either offering to do violence or actually doing it." *Walker v. State*, 965 So. 2d 1281, 1284 (Fla. 2d DCA 2007).

Here, viewing the evidence in the light most favorable to Plaintiff, after Plaintiff was shot by Agent Sanford Plaintiff continued running, threw away his gun, ignored police commands to stop, and kept running in the direction of Sergeant Davis. Plaintiff was then shot by Sergeant Davis. Plaintiff's conviction for resisting an officer with violence could still be upheld based on his interactions with Agent Sanford or Officer Gorham.

Likewise, Plaintiff's excessive force claims would not be *Heck*-barred by his convictions for carrying a concealed firearm, possession of a firearm

with an altered serial number, or possession of a firearm by a convicted felon. It is undisputed that Plaintiff was carrying a concealed weapon, that the firearm had an altered serial number, and that he was a convicted felon at the time. Thus, a finding in Plaintiff's favor would not necessarily undermine these convictions. Accordingly, Plaintiff's excessive force claim against Sergeant Davis is not barred by *Heck*.

### B.   Qualified Immunity

Even if Plaintiff's excessive force claim against Agent Sanford was not *Heck*-barred, Agent Sanford is, nonetheless, entitled to qualified immunity. Similarly, although Plaintiff's claim against Sergeant Davis is not *Heck*-Barred, Sergeant Davis is, nonetheless, also entitled to qualified immunity.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies to a government official performing a discretionary function, a court must consider two factors: (1) whether the evidence shows that the official's conduct violated a constitutional right; and (2) whether the right was clearly

established. *Person v. Callahan*, 555 U.S. 223, 236 (2009). A court has the

discretion to address the two prongs in either order. *Id.* "The relevant,

dispositive inquiry in determining whether a right is clearly established is

whether it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202

(2001).

The undisputed evidence here demonstrates that Agent Sanford and

Sergeant Davis were government officials acting within their discretionary

authority. "Discretionary authority" includes all actions by a government

official that "were undertaken pursuant to the performance of his duties,"

and were "within the scope of his authority." *Jordan v. Doe*, 38 F.3d 1559,

1566 (11th Cir. 1994) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th

Cir. 1988)). A fundamental duty of a law enforcement officer is to make

arrests. *See Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 740 (11th Cir.

2010) (discussing a law enforcement officer's right to arrest); *Williams v.

United States*, 314 F. App'x 253, 257 (11th Cir. 2009) ("it is the mandatory

duty of law enforcement agents to enforce the law").

Plaintiff does not dispute that Defendants Sanford and Davis were

both law enforcement officers assisting in effectuating Plaintiff's arrest.

Thus, both were government officials undertaking actions pursuant to the

performance of their duty to arrest Plaintiff. Consequently, the question

becomes whether Defendants Sanford and Davis violated Plaintiff's clearly

established constitutional rights of which a reasonable person would have

known.

The Fourth Amendment's prohibition on unreasonable searches and

seizures "encompasses the right to be free from excessive force during the

course of a criminal apprehension." *Oliver v. Fiorino*, 586 F.3d 898, 905

(11th Cir. 2009); *see also* U.S. Const. amend. IV. A police officer's use of

force violates the Fourth Amendment if it is objectively unreasonable in

light of the circumstances. *Graham v. Connor*, 490 U.S. 386, 395–97

(1989). The test of reasonableness under the Fourth Amendment,

> requires careful attention to the facts and circumstances of
> each particular case, including [1] the severity of the crime at
> issue, [2] whether the suspect poses an immediate threat to the
> safety of the officers or others, and [3] whether he is actively
> resisting arrest or attempting to evade arrest by flight.

*Id.* at 396.; *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir.

1993).

> [T]he Supreme Court [has] held that a police officer may use
> deadly force to seize a fleeing felony suspect when the officer:
> (1) "has probable cause to believe that the suspect poses a
> threat of serious physical harm, either to the officer or to
> others" or "that he has committed a crime involving the infliction
> or threatened infliction of serious physical harm," (2)
> reasonably believes that the use of deadly force was necessary
> to prevent escape; and (3) has given some warning about the

possible use of deadly force, if feasible.

*Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003) (quoting

*Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)). There is, however, no

"magical on/off switch that triggers rigid preconditions" for when an officer

may use deadly force. *Scott v. Harris*, 550 U.S. 372, 382 (2007). Each

situation must be analyzed under the Fourth Amendment's

"reasonableness" test. *Id.*; *Graham*, 490 U.S. at 388.

"An officer will be entitled to qualified immunity if his actions were

objectively reasonable, that is, if an objectively reasonable officer in the

same situation could have believed that the force used was not excessive."

*Vineyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). Courts view the

circumstances "from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

"The calculus of reasonableness must embody allowance for the fact that

police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—about the

amount of force that is necessary in a particular situation." *Id.* at 396–97.

Qualified immunity operates "to protect officers from the sometimes 'hazy

border between excessive and acceptable force,' . . . and to ensure that

before they are subjected to suit, officers are on notice that their conduct is

unlawful." *Saucier*, 533 U.S. at 206 (internal quotation omitted).

> Because the focus is on whether the officer had fair notice that
> her conduct was unlawful, reasonableness is judged against
> the backdrop of the law at the time of the conduct. If the law at
> that time did not clearly establish that the officer's conduct
> would violate the Constitution, the officer should not be subject
> to liability or, indeed, even the burdens of litigation. It is
> important to emphasize that this inquiry "must be undertaken in
> light of the specific context of the case, not as a broad general
> proposition."

*Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quotation omitted).

## 1.   Agent Sanford

Without question there are genuine disputes of fact regarding the
events that took place between Agent Sanford and Plaintiff on December
1, 2011. Plaintiff's sworn allegations differ significantly from the evidence
Defendants have submitted. More problematically, Plaintiff's own trial
testimony also differs greatly from his own sworn allegations. Despite the
genuine issues of fact, however, viewing the evidence in the light most
favorable to Plaintiff demonstrates that Agent Sanford's use of force was
not excessive, nor did it violate clearly established law.

In several ways Plaintiff has failed to establish that Agent Sanford's
use of force violated the Fourth Amendment. First, Agent Sanford had
probable cause to believe Plaintiff posed a threat of serious physical harm
to Agent Sanford, the other officers, and the general public. Plaintiff admits

that law enforcement received a tip from a CI that Plaintiff was the person responsible for the violent, armed takeover-style bank robberies. The CI told law enforcement officers she was Plaintiff's girlfriend. According to Plaintiff, they had been dating for four years. Law enforcement also knew that Plaintiff was a member of a local gang and that because Plaintiff wanted to become the leader of the gang, he tried to assert his dominance through violence and pistol whippings. The officers were also told that Plaintiff was always armed with a handgun and had access to at least two different handguns. Law enforcement was also aware that Plaintiff had an extensive criminal history, including violent felonies such as robbery and kidnaping.

In addition to their awareness and information concerning Plaintiff's propensity for violence, the CI was working actively with law enforcement to aid in arresting Plaintiff on December 1, 2011, including identifying Plaintiff on-scene as the target suspect for the operations team.[8] Agent

---

[8] This information belies Plaintiff's assertion that the officers did not know that he was the specific individual they were looking for that night. *See* ECF No. 58 at 5. Plaintiff attempts to make a connection between the CI's tip and Defendant's alleged use of force. His connection, however, is tenuous at best. The question in an excessive force claim is not whether the officers had probable cause to attempt the arrest in the first place. The question is whether during the execution of the arrest, excessive force was used. To the extent Plaintiff claims their failure to investigate the tip resulted in excessive force because they incorrectly believed he was dangerous, the undisputed fact that Plaintiff did in fact have a weapon on him at the time of the arrest refutes his argument. Moreover,

[f]or probable cause to exist, an arrest must be objectively reasonable

Sanford was one of the law enforcement officers on the team that would

arrest Plaintiff with this background knowledge.

Moreover, as Agent Sanford pulled up with knowledge of Plaintiff's

propensity for violence, it is undisputed that Agent Sanford saw Plaintiff

holding something with both hands and that Plaintiff turned to look toward

Agent Sanford.  Notably, Plaintiff does not deny that Agent Sanford began

yelling that Plaintiff had a gun. Plaintiff even admits that he was armed at

the time. Plaintiff also admits that he knew the police were looking for him.

Plaintiff began fleeing toward Agent Sanford's direction and reached the

vehicle door that Agent Sanford was crouched behind.  Based upon these

undisputed facts, a reasonable officer would have probable cause to

believe Plaintiff posed a threat of serious physical harm to himself and

---

based on the totality of the circumstances. This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. Although probable cause requires more than suspicion, it does not require convincing proof, and need not reach the same standard of conclusiveness and probability as the facts necessary to support a conviction.

*United States v. Dunn*, 345 F.3d 1285, 1290 (11th Cir. 2003) (internal punctuation marks and citations omitted). Surely, the officers had probable cause to arrest Plaintiff. This was not a situation where the CI called law enforcement, said Plaintiff was responsible for the armed robberies, and refused to give any additional information. Instead, the CI identified herself as Plaintiff's girlfriend and then continued working with law enforcement to effectuate Plaintiff's arrest. Furthermore, law enforcement had been investigating Plaintiff's background and were aware that Plaintiff was always armed, involved in a gang, and was frequently responsible for pistol whippings of other gang members. Notably, Plaintiff does not dispute these facts. This alone is sufficient to establish probable cause to believe Plaintiff was armed and dangerous.

others.

Although Plaintiff says he was holding his phone and did not have his gun drawn, whether or not his gun was actually drawn prior to being shot is irrelevant. The Eleventh Circuit has held that a police office is entitled to continue his use of force until a suspect thought to be armed is fully secured. *See Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (police officer's use of canine was objectively reasonable where officer believed suspect was armed and suspect was not yet secured, even though suspect attempted to surrender); *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (regardless of whether suspect had drawn his gun, the use of deadly force on an armed suspect of violent crimes who attempted to elude police and then suddenly confronted the police, was reasonable because the gun was available for ready use).

Here, it is undisputed that Plaintiff was still in possession of his gun when he was shot—whether it was concealed or drawn. It is also undisputed that the arrest team knew Plaintiff always carried a gun on his person. Plaintiff had not surrendered nor was he simply standing still or at a distance from Agent Sanford. Plaintiff ignored Agent Sanford's command to get down and instead ran toward Agent Sanford and was so close that Agent Sanford did not even have time to put his vehicle in park before

opening his door and ducking behind the door for cover. It was, therefore, not unreasonable for Agent Sanford to use deadly force on Plaintiff.

Furthermore, Plaintiff's convictions for aggravated assault on a law enforcement officer with a firearm and resisting an officer with violence undermine Plaintiff's testimony that he was simply holding his phone and that his gun was concealed. As discussed, under *Heck*, that version of facts cannot be accepted as true because Plaintiff has not shown that his convictions have been invalidated. Surely, where a suspect intentionally threatens to do violence to an officer, coupled with an apparent ability to do so, and where the suspect carries, displays, uses, threatens to use, or attempts to use a firearm, the officer has probable cause to believe the suspect poses a threat of serious physical harm to the officer and others.

Nonetheless, even if Plaintiff's gun had still been concealed at that point, the concealment did not diminish the threat of serious bodily harm to Agent Sanford or others. *See Harrell v. Decatur, Cnty., Ga.*, 22 F.3d 1570, 1580–81 (11th Cir. 1994) (Dubina, J., dissenting) (police officer entitled to qualified immunity where the officer shot and killed felony suspect because the officer reasonably could have believed the suspect was reaching under a car seat for a weapon), *vacated*, 41 F.3d 1494 (11th Cir. 1995) (adopting Judge Dubina's dissenting opinion); *Btesh v. City of Maitland, Fla.,* No.

6:10-cv-71-Orl-19DAB, 2011 WL 3269647, at *21 (M.D. Fla. July 29, 2011) (threat of serious bodily harm to officer existed where suspect's hands were closed together near his chest and only several seconds elapsed between the time the suspect turned toward the officer and aggressively started walking toward the officer, despite the fact that the suspect was not armed).  Even viewing the evidence in the light most favorable to Plaintiff and assuming Plaintiff's gun was still concealed, the concealment of the gun would not have diminished the threat of serious physical harm to Agent Sanford and others.

Secondly, it was also reasonable for Agent Sanford to believe the use of deadly force was necessary to prevent escape and to prevent harm to himself and others. Notably, Plaintiff failed to heed Agent Sanford's command to get on the ground. Instead, Plaintiff kept running. Plaintiff even admits that he was trying to get away.

In addition, a reasonable officer could have perceived Plaintiff's flight toward Agent Sanford as presenting imminent danger. It is undisputed that Plaintiff had a gun and that Plaintiff continued running in Agent Sanford's direction even though Agent Sanford was yelling "gun!" Surely, a reasonable officer could perceive he was in imminent danger while an armed suspect continued running toward the officer despite the officer

yelling, "gun!" *See Jean-Baptiste*, 627 F.3d at 821 (deadly force justified when armed suspect of violent crimes confronted officer in an ambush).

Plaintiff's assertion that he was not trying to harm anyone is undermined by his convictions for aggravated assault on a law enforcement officer with a firearm and resisting an officer with violence. And whether Plaintiff was actually going to hurt anyone would not change the analysis. "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier*, 533 U.S. at 205. Thus, even if Plaintiff had not yet drawn his gun, Agent Sanford would be justified in using deadly force. *See Jean-Baptiste*, 627 F.3d at 821 ("Regardless of whether Jean-Baptiste had drawn his gun, Jean-Baptiste's gun was available for ready use, and Gutierrez was not required to wait 'and hope for the best.'"). Agent Sanford was not required to crouch behind the door of his vehicle and hope that Plaintiff simply ran past him without harming Agent Sanford or others.

Thirdly, although Agent Sanford did not warn Plaintiff that he was going to shoot, a reasonable officer in Agent Sanford's position likely would find it not feasible to warn Plaintiff prior to shooting. The events here took place so quickly that Agent Sanford did not even have time to put his car in

park before ducking for cover. Then, only seconds later, Plaintiff was at the door of Agent Sanford's vehicle. In light of such quickly-evolving events, it was not unreasonable for Agent Sanford to employ deadly force. *See Jean-Baptiste* , 627 F.3d at 821 (officer entitled to qualified immunity even though he did not give warning before firing his gun because suspect was one of violent crimes, suspect eluded and then suddenly confronted the officer, and the officer only had seconds to decide whether to employ deadly force); *Riordan v. O'Shea*, 448 F. App'x 928, 931 (11th Cir. 2011) (officer "cannot be constitutionally faulted for failing to warn [the plaintiff] in the seconds that he had to respond"); *McLenagan v. Karnes*, 27 F.3d 1002, 1007–08 (4th Cir. 2003) (use of force was reasonable and a warning was unnecessary where the officer heard another officer yell that the suspect had a gun, and upon turning to see the suspect almost upon him, the officer shot the suspect and then saw the suspect did not have a gun); *Puglise v. Cobb Cnty., Ga.*, 4 F. Supp. 2d 1172, 1180 (N.D. Ga. 1998) (it was not feasible to warn about the possible use of deadly force where suspect would not permit officers to get close to his truck and the events unfolded in a quick and deadly manner).

Additionally, Plaintiff nonetheless had warning that Agent Sanford was a law enforcement officer. Plaintiff admits that he assumed the

individuals were police. Plaintiff also does not dispute that Agent Sanford was wearing a vest with "FBI" emblazoned in large light-colored letters on the front of the vest. Further, Agent Sanford ordered Plaintiff to get on the ground. Agent Sanford did not merely pull up and shoot Plaintiff without even once trying to obtain Plaintiff's cooperation.

Viewing the evidence in the light most favorable to Plaintiff, Agent Sanford had probable cause to believe Plaintiff posed a threat of serious physical harm to him and others. Agent Sanford also reasonably believed that deadly force was necessary to prevent escape and harm. Likewise, it was not feasible for Agent Sanford to give warning about the possible use of deadly force.  Accordingly, Agent Sanford's use of force was not objectively unreasonable and, therefore, did not constitute excessive force in violation of the Fourth Amendment.

Even if Agent Sanford's use of force was objectively unreasonable and, therefore, constituted excessive force, Plaintiff has nonetheless failed to prove that Agent Sanford's actions violated a clearly established constitutional right at the time of Plaintiff's arrest.

"For the law to be 'clearly established,' case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's

place, that what he is doing violates federal law." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000) (citing *Lassiter v. Ala. A&M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994)). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.

Generally, "no bright line exists for identifying when force is excessive" under the Fourth Amendment. *Priester*, 208 F.3d at 926 (citing *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)); *see also Bell v. Wolfish*, 441 U.S. 520, 559 (1979) ("The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."). Thus, "unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity." *Priester*, 208 F.3d at 926.

A narrow exception to this rule exists. When a plaintiff shows that the official's conduct lies "so far beyond the hazy border between excessive and acceptable force," such that the official had to know he was violating the Constitution, the official is not entitled to qualified immunity. *Vinyard v. Wilson,* 311 F.3d 1340, 1355 (11th Cir. 2002) (quoting *Priester*, 208 F.3d at 926; *Smith*, 127 F.3d at 1419)).

In this case, no law at the time of the incident clearly established that an officer violates the Fourth Amendment by shooting an armed and dangerous suspect when the suspect turns and runs toward the officer holding something that the officer reasonably believes is a weapon. Instead, the law was clearly established that there is no bright-line rule to determine when force is excessive.

Additionally, at the time, it was expressly not unconstitutional for an officer to use deadly force against a fleeing suspect, "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. And, as previously discussed, Agent Sanford had probable cause to believe that Plaintiff posed a threat of serious physical harm to him Sanford others.

Plaintiff cites no controlling Fourth Amendment case that declares materially similar conduct unconstitutional, nor has this Court found one based upon its own independent research. Accordingly, for the these reasons, Agent Sanford's actions do not fall so far beyond the hazy border between excessive and acceptable force that Agent Sanford should have known his conduct was unlawful. Agent Sanford is, therefore, entitled to

qualified immunity from Plaintiff's excessive force claim.[9]

## 2.    Sergeant Davis

As with Agent Sanford, there are genuine disputes of fact regarding the events that took place between Sergeant Davis and Plaintiff on December 1, 2011. Despite these issues, however, viewing the facts in the light most favorable to Plaintiff, the evidence demonstrates that Sergeant Davis' use of force did not violate clearly established law.

Plaintiff has failed to demonstrate that Sergeant Davis' use of force was objectively unreasonable in light of the circumstances on December 1, 2011. Viewing the evidence in the light most favorable to Plaintiff, Sergeant Davis had probable cause to believe Plaintiff posed a threat of serious physical harm to him, the other officers, and the public. In addition to the same background knowledge Agent Sanford learned about Plaintiff at the operational briefing, Sergeant Davis heard over the radio that Plaintiff had a gun, saw Plaintiff run toward Agent Sanford, and reasonably believed

---

[9]  Plaintiff's argument that his complaint alleges facts establishing a claim to which relief may be granted, is irrelevant. As the Court instructed Plaintiff in its summary judgment notice dated March 2, 2016, Defendant's motion would be resolved as a motion for summary judgment and Plaintiff was required to file supporting evidentiary materials with his response. (ECF No. 46.) Whether Plaintiff has alleged facts plausibly suggesting that he is entitled to judgment as a matter of law is the proper standard for a motion to dismiss for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). That is not the standard for a motion for summary judgment. Instead, the question is whether there is any genuine dispute as to any material fact, and if not, whether the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

Plaintiff had fired at Agent Sanford. Then, Plaintiff continued running toward Sergeant Davis. It is undisputed that at that point, someone was yelling "Police, stop!" Plaintiff, however, failed to obey the command. Plaintiff was still armed and Plaintiff's gun was in his hand—at least at some point—while he ran toward Sergeant Davis. On these undisputed facts, a reasonable officer would have probable cause to believe Plaintiff posed a threat of serious physical harm to the officer and others.

Despite the fact that law enforcement later learned that Plaintiff got rid of his gun seconds before Sergeant Davis shot Plaintiff, Sergeant Davis' use of force was not unreasonable. Where a police officer believes a suspect is armed and the suspect is not yet secured, use of force can be objectively reasonable. *See Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (police officer's use of canine was objectively reasonable where officer believed suspect was armed and suspect was not yet secured, even though suspect attempted to surrender). Plaintiff does not dispute that Sergeant Davis believed Plaintiff was still armed when he shot Plaintiff. Furthermore, even if Sergeant Davis had seen Plaintiff get rid of his gun, Sergeant Davis knew, and Plaintiff does not contest, that Plaintiff had ready access to at least two different handguns. It is also undisputed that Plaintiff still had something in his hand when Sergeant Davis shot Plaintiff.

Based upon these undisputed facts there is little question that there was probable cause to believe that Plaintiff posed a threat of serious harm to Sergeant Davis and others.

A reasonable officer in Sergeant Davis' position could also conclude that use of force was necessary to prevent Plaintiff from escaping or harming Sergeant Davis or others. A police officer is entitled to continue his use of force until a suspect thought to be armed is "fully secured." *Clark v. City of Atlanta, Ga.*, 544 F. App'x 848, 856 (11th Cir. 2013) (citing *Crenshaw*, 556 F.3d at 1293). "[O]nce an arrest has been fully secured and any potential danger or risk of flight vitiated, a police officer cannot employ . . . severe and unnecessary force . . . ." *Lee v. Ferraro*, 284 F.3d 1188, 1200 (11th Cir. 2002).

In this case, it is undisputed that Sergeant Davis thought Plaintiff was still armed at the time he shot Plaintiff. Sergeant Davis also thought Plaintiff had shot at Agent Sanford, thereby committing a felony during the arrest. *See Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir.1997) (qualified immunity applies where undisputed evidence showed plaintiff disregarded officer's command to stop and was fleeing with a sawed-off shotgun, mere possession of which is a felony under Florida law). It is undisputed that Plaintiff did not heed commands to stop. Accordingly, the risk of danger to

the officers, bystanders, and the public had not passed. *Cf. Lee*, 284 F.3d at 1199 (slamming arrestee's head against the trunk of a police car was excessive and unreasonable because arrestee had been handcuffed and completely secured so "any danger to the arresting officer as well as any risk of flight had passed"). This was not a situation where Plaintiff was running in the opposite direction of the officers. *Cf. Pablo Hernandez v. City of Miami*, 302 F. Supp. 2d 1373, 1379–80 (S.D. Fla. 2004) (genuine issue of material fact existed as to whether suspect's flight presented an immediate threat of serious harm to officer or others at the time officer shot suspect where suspect had dropped his weapon and was running away unarmed). Instead, Plaintiff—ignoring police commands to stop—was running toward Sergeant Davis, who had his gun drawn and pointed at Plaintiff. No reasonable officer would believe that a suspect did not pose an immediate threat of serious harm when the suspect continued running directly towards an officer that had his gun drawn, despite commands to stop.

Furthermore, although Sergeant Davis did not warn Plaintiff that he was going to shoot, the failure to do so does not render Sergeant Davis' action unconstitutional. The Eleventh Circuit has made clear that a police officer need not always call out a warning before using deadly force. *See,*

*e.g.*, *Carr v. Tatangelo*, 338 F.3d 1259, 1269 n.19 (11th Cir. 2003) (quoting

*McLenagan*, 27 F.3d at 1007–08).[10] Nor will the court second guess a

police officer's split-second decision to use deadly force where it appears

to the officer that lives are endangered. *Id.*; *see also Garner*, 471 U.S. at 3

(using deadly force, without warning, on an unarmed, retreating suspect is

excessive "unless it is necessary to prevent the escape and the officer has

probable cause to believe the suspect poses a significant threat of death or

serious physical injury to the office or others").

Here, it is undisputed that Plaintiff was running toward Sergeant

Davis, Agent Sanford yelled that Plaintiff had a gun, and officers radioed

that Plaintiff had a gun. Further, there is no dispute that Plaintiff had a gun

in his hand (at least at some point while he was running), and Plaintiff still

had something in his hand—which Sergeant Davis believed was a

gun—when Sergeant Davis shot Plaintiff. Sergeant Davis' decision to shoot

was a split second decision where it appeared that lives were endangered.

---

[10] The Eleventh Circuit, in *Carr*, adopted the following rationale from *McLenagan*: "For all the officer knew, the hesitation involved in giving a warning could readily cause such a warning to be his last. We decline, therefore, to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where, as here, such a warning might easily have cost the officer his life. . . . . It is true that the officer did not see a gun in the suspect's hands, but it is also true that he could not confirm that the suspect was unarmed. We will not second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officers and others." 338 F.3d at 1269 n.19.

Furthermore, Plaintiff was already on notice that he would be shot if he continued running. Agent Sanford already had shot Plaintiff, which provided more than adequate warning to Plaintiff that he would be shot if he did not heed commands. Nonetheless, as Plaintiff continued running, the team yelled "police, stop!" Plaintiff again failed to heed commands. The constitution does not require law enforcement to provide a warning prior to each subsequent shot being fired.  And, despite the fact that Sergeant Davis did not personally identify himself as a law enforcement officer prior to shooting, Plaintiff does not contest that other officers were yelling "police, stop!" These facts negate Plaintiff's argument that he would not have fled and would have surrendered if he knew they were law enforcement. The evidence in this case demonstrates that Sergeant Davis' actions were objectively reasonable, and therefore, did not constitute excessive force in violation of the Fourth Amendment.

Even assuming, *arguendo*, that Sergeant Davis' actions were unconstitutional, the law was not clearly established at the time of the incident to put reasonable officers on notice that such conduct violates the Fourth Amendment. The Court has found no controlling or materially similar Fourth Amendment case that declares it to be unlawful for an officer to shoot a fleeing suspect, who is reasonably believed to be armed and

dangerous, who fails to heed police commands to stop, and who appeared to shoot at another officer seconds before. *See Priester*, 208 F.3d at 926. Plaintiff has also failed to point to any such cases. Accordingly, for the reasons previously discussed, Sergeant Davis' conduct was not so far beyond the hazy border between excessive and acceptable force to put Sergeant Davis on notice that his conduct would violate the Fourth Amendment. *See Vinyard,* 311 F.3d at 1355. Sergeant Davis is, therefore, entitled to qualified immunity from Plaintiff's excessive force claim.

## V.  CONCLUSION

Plaintiff's excessive force claims against Agent Sanford is *Heck*-barred because, if proven, it would necessarily undermine the validity of Plaintiff's conviction for aggravated assault on a law enforcement officer with a firearm. Nonetheless, even if Plaintiff's claim was not Heck-barred, viewing the evidence in the light most favorable to Plaintiff, Agent Sanford is entitled to qualified immunity because his actions were not unreasonable under the Fourth Amendment, nor did his actions violate clearly established law. Similarly, although *Heck* does not bar Plaintiff's excessive force claim against Sergeant Davis, Sergeant Davis is entitled to qualified immunity because his actions were not unreasonable under the Fourth Amendment, nor did his actions violate clearly established law.

Accordingly, Agent Sanford and Sergeant Davis are entitled to judgment as a matter of law.

## VI.  RECOMMENDATION

In light of the foregoing, it is respectfully **RECOMMENDED** that:

1.   Defendant Special Agent Patrick Sanford's Motion for Summary Judgment, ECF No. 44, should be **GRANTED.**

2.   Defendant Brain Davis' Motion for Summary Judgment, ECF No. 49, should be **GRANTED.**

**IN CHAMBERS** this 30th day of August, 2016.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the Court's internal use only, and does not control. A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**